IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HANNA LAYTON and LINDA COSTAS,[1] | § § § | Nos. 87, 2018; 100, 2018; and 125, 2018 |
| Respondents Below, Appellants, | § § § | **Consolidated** |
| v. | § § § | Court Below—Family Court of the State of Delaware |
| JACKSON P. LAYTON, | § § | C.A. No. CN15-04403 Petition Nos. 17-22998 and |
| Petitioner Below, Appellee. | § § | 17-24587 |

Submitted: August 17, 2018
Decided: October 23, 2018

Before **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

## ORDER

Upon consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    The appellants, Hanna Layton ("Mother") and Linda Costas ("Grandmother"), filed these consolidated appeals from three Family Court orders. The underlying case involves Jackson Layton ("Father") and Mother's two daughters ("the Children") and Father's efforts to visit and reunify with the Children. At the time these appeals were filed, the Children were under

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

the guardianship of Grandmother.[2]  In the orders on appeal, the Family Court found Mother and Grandmother in contempt of its prior orders regarding Father's visitation and reunification therapy with the Children.  The Family Court also ordered Mother to pay attorneys' fees to Father's counsel[3] and ordered Grandmother to pay $2000 to secure the services of a new reunification therapist.  After careful consideration, we find no merit to these consolidated appeals.  Accordingly, we affirm the Family Court's judgments.

(2)    The Children were born on April 28, 2004 and March 25, 2007. The family's history is long and complicated.  It appears that Mother and Father became estranged from one another in 2011, and Mother was awarded sole custody of the Children in November 2013.  In August 2015, Grandmother, through counsel, filed a petition for guardianship of the Children.  Mother's whereabouts were unknown at the time.  Although she failed to file an answer to the guardianship petition, she later appeared in person to support the petition.  Father, through counsel, objected to the

---

[2] Although the Family Court initially stayed its consideration of Father's petition to rescind Grandmother's guardianship pending reunification therapy, the Family Court later lifted the stay and granted Father's petition for rescission after these appeals were filed.  Mother and Grandmother filed several different appeals from the rescission proceedings, which are pending before the Court.

[3] Father's counsel is representing Father on a *pro bono* basis by assignment from a group providing services to military veterans.  In turn, Father's counsel was directed to forward Mother's installment payments of $200 per month to the Veteran's Clinic associated with the Delaware Law School.

petition. In March 2016, the parties reached an agreement for a temporary guardianship order pending a hearing in July 2016. The temporary order included the parties' stipulation that Father and the Children would engage in reunification therapy with Dr. Samuel Romirowsky in consultation with the Children's therapist, Jennifer Cutrona.

(3) After a two-day trial, the Family Court granted Grandmother's petition for guardianship on August 10, 2016 ("the Guardianship Order").[4] As part of the Guardianship Order, the Family Court cautioned Mother and Grandmother to cooperate with the previously agreed-to reunification therapy between Father and the Children. The Family Court stated that it would "not tolerate interference with Father's attempts to improve" his relationship with the Children.[5] The Family Court further warned Mother and Grandmother that, while it did not want to uproot the Children and remove them from Grandmother's home at present, "the Court will seriously consider moving the children to Ohio [where Father lives] on a permanent basis if the maternal family acts as an impediment to Father's efforts."[6] The Guardianship Order awarded Father visitation with the Children "as determined appropriate by Dr. Romirowsky," and stated that, if Dr. Romirowsky believed that the maternal

---

[4] *Costas v. Layton*, File No. CN15-04403, Pet. No. 15-24413 (Del. Fam. Ct. Aug. 10, 2016).
[5] *Id*. at 22.
[6] *Id*.

3

family was interfering with Father's visitation, then the Court would consider imposing sanctions that might include granting "additional visitation to Father, fines, incarceration, or a change in custody…."[7]

(4)     In December 2016, Father filed a petition for a rule to show cause, alleging that Grandmother and Mother were in contempt of the Guardianship Order by thwarting the progress of his reunification with the Children. After two days of hearings, the Family Court issued an order dated June 5, 2017, finding both Mother and Grandmother in contempt ("the First Contempt Order").[8]  The Family Court warned them against "continuing to display a negative and hateful attitude towards Father to the girls" and stated that the Court would "tolerate no contempt of this Order."[9]  The Court ordered that "Dr. Romirowsky shall schedule reunification therapy/visits between Father and the girls at his discretion and shall solely be responsible for setting the frequency, date, time and length of the contact."[10]

(5)     Thereafter, Mother and Grandmother filed a petition for a rule to show cause in July 2017, alleging that Father was in contempt of the First Contempt Order and requesting, among other things, that the reunification

---

[7] *Id*. at 23-24.
[8] *Layton v. Costas*, File No. CN11-03412, Pet. No. 16-38190 (Del. Fam. Ct. June 5, 2017).
[9] *Id.* at 13.
[10] *Id.*

4

therapy with Dr. Romirowsky be discontinued. Father, in turn, filed a petition for a rule to show cause, alleging that Mother and Grandmother were in contempt of the First Contempt Order. Among other things, Father asked the Family Court to rescind Grandmother's guardianship as a sanction for her ongoing contempt and interference with Father's attempts to reunify with the Children.

(6) The Family Court held three days of hearings in January and February 2018 on the parties' cross-petitions. Dr. Romirowsky testified that, before Mother and Grandmother cut off his contact with the Children, he had had more than twenty sessions with the Children and Father. When they started therapy, the Children indicated they had no memories of Father, either good or bad, but they were interested in developing their relationship with him. Dr. Romirowsky testified that, on multiple occasions, the therapy sessions would be interrupted by members of the maternal family. On one occasion, when Father was participating in the session via Skype, Mother walked into the session unannounced and ended it prematurely, stating that the Children needed to have their dinner. Dr. Romirowsky finally told the maternal family members that they were not allowed in his office but had to wait outside during his sessions with the Children and Father.

(7)    Dr. Romirowsky testified that, while sometimes the sessions started with the Children protesting, the sessions quickly dissipated into warm, playful and affectionate interaction between Father and the Children. Based on his experience with the parties and in light of the Family Court's order giving him the discretion to do so, Dr. Romirowsky testified that he approved Father taking the Children for visits in the community on two dates in July 2017. Those visits were to be followed by debriefing with the parties in his office, and if Dr. Romirowsky determined those visits had gone well, then Father would be permitted to have two overnight visits with the Children in August 2017. Dr. Romirowsky testified that Grandmother refused to cooperate with his approved visitation plans, telling him that the Children would not attend any of those visits.

(8)    In September 2017, Grandmother and Mother appeared at Dr. Romirowsky's office without an appointment while he was in session with another patient, demanding that he turn over the Children's files. Dr. Romirowsky explained that he could not release the files unless a proper release was signed by both Grandmother and Father. One of the women then called the police on her cell phone and began yelling into the phone that the doctor was a liar. Dr. Romirowsky testified that one of his patients in the waiting room was so disturbed by the ruckus that he left the office. Dr.

Romirowsky also testified that he received a letter from Mother in November 2017 stating that he was not permitted to have any further contact with the Children.

(9)     Dr. Romirowsky expressed the opinion that Mother and Grandmother had created a toxic environment for the Children's reunification efforts and had placed enormous pressure on the Children not to have a relationship with Father.  He believed that the maternal family was planting false memories in the Children and, in short, that the Children were being "brainwashed."  Dr. Romirowksy testified that, because Grandmother was blocking the reunification process, he would not continue undertaking reunification therapy while the Children remained under Grandmother's guardianship.

(10)   In addition to Dr. Romirowsky, the Family Court also heard testimony from Father, Mother, Grandmother, Father's stepfather, Mother's father, the Children's therapist, and Dr. Romirowsky's office assistant.  The Family Court also spoke briefly with the Children and listened to numerous recorded Skype conversations between Father and the Children, which had been made without Father's knowledge and were offered into evidence by Mother and Grandmother.

(11) On February 8, 2018, the Family Court issued a twenty-six page opinion, setting forth all of the testimony and evidence presented during the three-day hearing ("the Second Contempt Order").[11] The Court concluded that the First Contempt Order gave Dr. Romirowsky sole discretion for scheduling therapy and visits between Father and the Children. Dr. Romirowsky had determined that it was appropriate for Father to go straight to community visits with the girls rather than engaging in further therapy sessions in Dr. Romirowsky's office. Thus, Father was not in contempt of the First Contempt Order for failing to engage in further counseling with the Children before attempting to schedule community visits. The Family Court denied Mother and Grandmother's petition for a rule to show cause.

(12) As to Father's petition for a rule to show cause against Mother and Grandmother, the Family Court concluded that several of Father's allegations were not supported by clear and convincing evidence. Nonetheless, as to Mother, the Family Court found that her letter to Dr. Romirowsky, stating that the doctor did not have her permission to engage in further therapy sessions with the Children, was a clear violation of the First Contempt Order, which provided that Mother and Grandmother were to

---

[11] *Costas v. Layton*, File No. CN15-04403, Pet. Nos. 17-22998, *et al.* (Del. Fam. Ct. Feb. 8, 2018).

follow the schedule set by Dr. Romirowsky and to follow his recommendations for treatment. The Family Court ordered Mother to reimburse Father's counsel's fees and costs incurred in filing and prosecuting his contempt petition.

(13) As to Grandmother, the Family Court concluded that there was clear and convincing evidence that she had violated the First Contempt Order in multiple ways, including refusing to follow Dr. Romirowsky's schedule for visitation by declaring that further visits "were not going to happen," by disrupting what was left of Dr. Romirowsky's therapeutic relationship with the Children when she appeared unannounced in his office and demanded the Children's files in a belligerent and harassing manner, and by making or permitting other family members to make disparaging remarks about Father within the Children's hearing.

(14) The Family Court further found that Grandmother had failed in her statutory responsibilities as guardian of the Children to provide for their emotional well-being and to comply with all Court orders because she failed to support the Children's reunification efforts and she allowed Mother daily access to the Children and participated with Mother in the continued poisoning of the Children against Father. Despite this conclusion, the Family Court stayed further consideration of Father's petition to rescind

9

Grandmother's guardianship, pending further reunification efforts with a new therapist. To retain a new therapist, Grandmother was ordered to pay $10,000 to Father's counsel, who would hold the money in escrow until further order of the Court. The Family Court stated that it would schedule a review hearing for each Monday following every appointment with the new therapist.

(15) On February 20, 2018, the Family Court entered its final order on attorney's fees, requiring Mother to pay Father's attorney $8900 in fees and costs, payable at a rate of $200 per month until paid in full ("the Attorney's Fees Order"). Thereafter, on February 23, 2018, the Family Court, following a review hearing with the parties on the progress of the reunification therapy, issued a modification to the Second Contempt Order, reducing Grandmother's obligation from $10,000 to $2,000 to pay for the reunification therapy ("the Revised Contempt Order"). The Family Court gave Grandmother until March 14, 2018 to make the payment and noted that the first therapy appointment was to be scheduled for March 16, 2018. Grandmother never made the payment, and reunification therapy with a new therapist never occurred.

(16) Mother and Grandmother filed these appeals, challenging the Second Contempt Order, the Attorney's Fees Order, and the Revised Contempt Order. Although they raise six issues, only four were properly

10

raised in this appeal.[12]  First, they contend that the Family Court abused its discretion by completely disregarding the testimony of Jennifer Cutrona, the Children's therapist, in favor of Dr. Romirowsky's testimony.  Second, they contend that the Family Court erred in finding them in contempt because the First Contempt Order required three additional therapy sessions before Dr. Romirowsky could approve community visits between Father and the Children.  Third, they contend that the Family Court's conclusion that the three therapy session anticipated by the First Contempt Order were not mandatory reflects judicial bias.  And fourth, they contend that the Family Court did not conduct a proper interview of the Children.

(17)  In his answering brief, Father raises several points.  First, he contends that the appeals should be dismissed for Mother and Grandmother's ongoing contempt of the Guardianship Order, the First Contempt Order, the Second Contempt Order, and the Revised Contempt Order.  Second, Father

---

[12] There are six claims raised in the body of the Argument section of the appellants' opening brief on appeal. These six arguments do not correspond to the six arguments contained in the opening brief's Summary of Argument section. *See Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993) (noting that, under Supreme Court Rule 14(b)(vi)(A)(3), any argument that is not raised in the body of the argument section of the opening brief will not be considered by the Court on appeal).  The following arguments were not properly raised in this appeal - the Family Court abused its discretion in accepting Father's completion of an out-of-state domestic violence course as an adequate substitute for a Domestic Violence Coordinating Council course, which was previously addressed but was not part of the Second Contempt Order, and the Family Court erred in discharging the guardian *ad litem* who was appointed to represent the Children during the guardianship proceedings in 2016, which was not raised in and was irrelevant to the Second Contempt Order.  Supr. Ct. R. 8.

contends that any issue about Grandmother's payment for reunification therapy is moot because, after these appeals were filed, the Family Court rescinded Grandmother's guardianship of the Children and awarded Father custody. Finally, Father asserts that, if this Court reaches the merits of the appeals, the judgments of the Family Court should be affirmed because: (i) the Family Court did not err in denying the petition for contempt against Father; (ii) the Family Court did not err in finding both Mother and Grandmother in contempt of the First Contempt Order; and (iii) the Family Court did not err in ordering Mother to pay $8900 in legal fees as a sanction for her contempt.

(18) Our review of a Family Court order extends to the facts and the law as well as to the inferences and deductions made by the trial judge.[13] If the Family Court has correctly applied the law, our standard of review is abuse of discretion.[14] Although we have a duty to review the sufficiency of the evidence and to the test the propriety of the trial court's factual findings, we will not overturn those findings unless they are unsupported by the record or are clearly wrong.[15] When the determination of facts turns on a question of the credibility and the acceptance or rejection of the testimony of witnesses

[13] *Wife (J.F.V.) v. Husband (O.W.V., Jr.)*, 402 A.2d 1202, 1204 (Del. 1979).
[14] *Jones v. Lang*, 591 A.2d 185, 186 (Del. 1991).
[15] *Wife (J.F.V.)*, 402 A.2d at 1204.

appearing before the trial court, we will not substitute our opinion for that of the trier of fact.[16]

(19)    Father argues that we should dismiss these consolidated appeals without reaching the merits because of Mother's and Grandmother's ongoing contempt of the Family Court's orders.  Father relies upon this Court's ruling in *Schmidt v. Schmidt*,[17] where we held that a party who displays defiance of a trial court's order by refusing to comply with the order should not be permitted to appeal the substance of that ruling while persisting in his defiance.[18]  In *Schmidt*, the appellant sought review of a property division order without also seeking review of the Family Court's order finding him in contempt of the property division order.  Under those circumstances, we concluded that the appellant could not use the judicial process to appeal the merits of the underlying property division order.  We further noted, however, that our dismissal of the appeal was not to be construed as a ruling that one held in contempt could not seek review of the contempt determination itself.[19]

(20)    The circumstances in this case are distinguishable from *Schmidt*. In the present case, the parties are only appealing the Family Court's orders

---

[16] *Id.*
[17] 610 A.2d 1374 (Del. 1992).
[18] *Id.* at 1377.
[19] *Id.*

13

finding them in contempt of the court-ordered reunification therapy and awarding attorney's fees and imposing sanctions. The validity of the reunification therapy, which was part of a consent order entered in 2016, was never appealed and is not at issue here. The parties have a right to seek review of the Family Court's orders related to the contempt proceedings.

(21) Thus, we have considered the substance of Mother's and Grandmother's fairly-raised issues on appeal, but we find no merit to their arguments. The record reflects, contrary to their assertions, that the Family Court carefully considered all of the witnesses' testimony presented during the three-day hearing on the parties' cross-petitions resulting in the Second Contempt Order. The Family Court's findings that Mother and Grandmother were each in contempt of its prior orders regarding the reunification therapy, but that Father was not, are supported by clear and convincing evidence in the record and are not clearly wrong.

(22) The First Contempt Order gave Dr. Romirowsky the sole discretion to direct the reunification process and warned Mother and Grandmother about the potential consequences of their continued interference and contempt of the court-ordered reunification. Dr. Romirowsky's testimony at the hearing reflected that Mother wrote to him, saying that he was not permitted to have further contact with the Children. Dr. Romirowsky also

14

testified that Grandmother, among other things, refused to make the Children available for visits with Father that were approved by Dr. Romirowsky.

(23) Under these circumstances, we find no error in the Family Court's findings of contempt. Contrary to the appellants' argument, the Family Court did not abuse its discretion in finding Dr. Romirowsky's testimony to be credible and in giving that testimony more weight than the testimony of the witnesses presented by Mother and Grandmother. Such credibility determinations are entirely within the judge's discretion.[20] We also find no merit to the appellants' conclusory argument that the weight afforded Dr. Romirowsky's testimony is evidence of judicial bias or their contention that the judge conducted an "improper" interview of the Children. Instead, we find that the record supports the Family Court's conclusion that Dr. Romirowsky testified credibly about Mother's and Grandmother's continuing interference with Father's reunification efforts. The Family Court also properly interviewed the Children. We also find no error in the Family Court's rejection for lack of credibility Mother's and Grandmother's purported justifications for their contemptuous conduct.

(24) Moreover, we find no abuse of the Family Court's discretion in ordering Mother to pay Father's attorney's fees. The Family Court has broad

---

[20] *Wife (J.F.V.)*, 402 A.2d at 1204.

15

discretion in deciding whether to award attorney's fees and costs.[21] The award in this case was to compensate Father's counsel for the time and effort that counsel expended in prosecuting a second contempt petition. Because Father's counsel is representing Father on a *pro bono* basis, the Family Court ordered that Mother would pay a reduced fee, to be forwarded by Father's counsel to a veterans' legal clinic. There is nothing in the record to support Mother's contention that the Family Court abused its discretion in awarding reasonable attorney's fees, payable in $200 monthly installments until paid in full. The award was not arbitrary or unreasonable.[22]

(25) We also find no abuse of the Family Court's discretion in sanctioning Grandmother for her contemptuous conduct.[23] The Family Court found that Grandmother's ongoing defiance and disruption of the court-ordered reunification process led Dr. Romirowsky to refuse to provide further reunification therapy. As a result of her contempt, the Family Court required Grandmother to pay $10,000 (later reduced by the Revised Contempt Order to $2000) in order to retain the services of a new reunification therapist.

---

[21] *Thomas v. Thomas*, 102 A.3d 1138,1150 (Del. 2014).

[22] *Id*. at 1150-51.

[23] Father argues that this issue was rendered moot by the Family Court's subsequent rescission of Grandmother's guardianship, which nullified the need for further reunification services. Because the rescission of Grandmother's guardianship is still pending appeal in this Court, the Family Court's contempt sanction against Grandmother arguably remains a "continuing justiciable controversy," which we will address on the merits. *See Family Court v. Alexander*, 522 A.2d 1265, 1268 (Del. 1987).

16

Under the circumstances, the compensatory sanction was justified and reasonable. There is no basis in the record to overturn the Family Court's finding that Grandmother could afford to pay $2000.

NOW, THEREFORE, IT IS ORDERED that the judgments of the Family Court are AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Justice